[No. 32226-2-III.   Division Three.   January 22, 2015.]

THE STATE OF WASHINGTON, *Respondent*, v. TROY J. WILCOXON, *Appellant*.

*Andrea Burkhart* (of *Burkhart & Burkhart PLLC*), for appellant.

*Benjamin C. Nichols, Prosecuting Attorney*, and *Curtis L. Liedkie, Deputy*, for respondent.

¶1   Korsmo, J. — Troy Wilcoxon appeals from his three convictions related to the burglary of a casino/bowling alley in Clarkston. He challenges the use of a codefendant's statement at their joint trial, the failure to giving a limiting instruction concerning that statement, an officer's testimony concerning the cell towers that processed telephone calls between the two defendants during the burglary, and the court's denial of his request for a continuance. We affirm.

## FACTS

¶2   Mr. Wilcoxon and his codefendant, James Nollette, were charged after a burglary in the early hours of May 23, 2013, at the Lancer Lanes Casino.[1] Mr. Wilcoxon worked as a dealer at the casino, but Mr. Nollette did not have a connection to the business. Prior to the burglary, both men had told others that Lancer Lanes would be a good burglary target because the security was poor.

¶3   Not coincidentally, at least according to the prosecutor's theory of the case, Lancer Lanes had been the subject of a failed burglary eight days earlier. On that earlier occasion, a man wearing a black plastic bag over his body had entered the building after hours and cut the power to the building's surveillance system by throwing a breaker switch.[2] The "popping" of the electricity awakened Eric

---

[1] The casino is also referred to as Bridge Street Connection throughout the trial record and briefing. We will use the name Lancer Lanes.

Glasson, a man who frequented Lancer Lanes and did odd jobs at the establishment in exchange for food. He had fallen asleep while watching television with the lights on. Glasson fled the building when the lights went out. His flight alerted the "bagman" burglar that the building was occupied. The bagman also fled without taking any property.

¶4 On the night of May 22, Mr. Wilcoxon invited Mr. Glasson to join him, several other employees of Lancer Lanes, and Mr. Nollette at the Candy Store, a Lewiston, Idaho, strip club. Mr. Glasson accompanied Mr. Wilcoxon to the establishment, where Mr. Wilcoxon paid his cover charge and purchased Mr. Glasson's first drink. Surveillance cameras at the Candy Store recorded the time of the group's arrival as 11:57 p.m. on May 22. At 12:51 a.m., less than hour later, Mr. Wilcoxon departed the group and did not return to the Candy Store. The Lancer Lanes group ultimately departed the Candy Store at 2:29 a.m.

¶5 Lancer Lanes was burglarized between 1:56 a.m. and 2:08 a.m. on May 23. Surveillance cameras (now equipped with battery backup) revealed that a single burglar, again dressed with a black garbage bag over his body, entered in the same manner as the May 15 attempted burglary and cut the power in the building. This time the burglar successfully stole $29,074.

¶6 Video surveillance at the Candy Store showed Mr. Nollette talking on his cell phone with someone at 2:02 a.m. Mr. Nollette later told his friend Gary Solem that he had been on the telephone with a "friend" while the "friend" committed the burglary. Police obtained cell phone records that established Mr. Nollette was talking to Mr. Wilcoxon during the burglary. The records also identified the cell tower that handled each of the phone calls. A call lasting 84 seconds made by Wilcoxon to Nollette at 1:59 a.m. was relayed by a cell tower within a couple hundred yards of Lancer Lanes.

---

[2] The disguise was sufficient to obscure the identity of the burglar. No one was charged with attempted burglary for the incident.

¶7 Sometime after 2:00 a.m., Wilcoxon and Nollette jointly showed up at the home of their friend Eric Bomar. They both appeared excited. Wilcoxon told Bomar that he had "pulled off the Lancer thing" and described how he had broken in to the establishment and taken the money.

¶8 Charges of second degree burglary, first degree theft, and conspiracy to commit burglary were filed against Mr. Wilcoxon. A single charge of conspiracy to commit second degree burglary was filed against Mr. Nollette. The prosecutor also filed notice of intent to seek an exceptional sentence against Mr. Wilcoxon, alleging that both the burglary and theft charges constituted major economic crimes and constituted a breach of trust by Mr. Wilcoxon.

¶9 Mr. Wilcoxon moved to sever his trial from Mr. Nollette's trial; he focused his argument primarily on the statements made by Mr. Nollette to Mr. Solem. After a hearing, the trial court denied the motion to sever. Mr. Wilcoxon did not renew his motion to sever at the end of trial.

¶10 The parties agreed that Sergeant Bryon Denny could present the cell phone records because there was no local telephone official who could do so. The court authorized telephonic testimony from the telephone company officials if desired by the defense. At a subsequent hearing the day before trial, defense counsel moved in limine to prohibit any witness from testifying that the cell phone records showed that a telephone call was made from Lancer Lanes. The trial court granted the motion in part and prohibited the prosecution from presenting evidence that the telephone call was made from inside Lancer Lanes. However, testimony that a specific telephone tower had handled a specific call was relevant and would be admitted.

¶11 Defense counsel asked the court to expand the ruling to prohibit reference to the specific towers that routed the phone calls. When that was denied, counsel moved to continue the trial in order to seek an expert to testify. The court denied the continuance, noting both that

the State was not using the officer as an expert and that the request came one hour before the end of business the day before trial. The motion was renewed when the sergeant testified at trial. The court again denied the continuance and noted that the sergeant was not testifying as an expert and that the prosecutor should not seek to elicit opinion testimony from him.

¶12 Sergeant Denny did testify for the jury that cell phone calls generally were routed from the tower with the strongest signal belonging to the service provider to the tower providing the strongest signal for the receiving party's service provider. While that often would mean the closest tower would provide the service, various factors or obstructions could mean that a more distant tower would handle the call. Neither defendant testified at trial, but each called a sibling as their sole witness.

¶13 The jury was unable to reach a verdict in Mr. Nollette's case, and a mistrial was declared.[3] The jury did find Mr. Wilcoxon guilty on all three counts and also found the presence of the two aggravating factors on the theft and burglary offenses. The trial court, citing the two aggravating factors, imposed exceptional concurrent sentences of 24 months in prison on the burglary and theft convictions. Mr. Wilcoxon then timely appealed to this court. A commissioner granted his request for an accelerated hearing of his appeal.

## ANALYSIS

¶14 Mr. Wilcoxon contends that his right to confront witnesses against him was violated in two respects when the court permitted Mr. Nollette's statements to come into evidence via Mr. Solem. We will treat those arguments as one before turning to two separate arguments Mr. Wilcoxon raises concerning the cell tower testimony presented by Sergeant Denny.

---

[3] The records of this appeal do not indicate the resolution of that case.

### Confrontation of Codefendant

¶15 Mr. Wilcoxon contends that his right to confront Mr. Nollette was violated by the failure of the court to sever the trials of the two defendants and the failure to sua sponte provide a limiting instruction for the jury. We conclude that there was no violation of the right to confrontation because Nollette's statements to Solem were not "testimonial" within the meaning of the Sixth Amendment.

¶16 The Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." This protection has special significance in the context of codefendants when one of them has made statements to the police that implicate the other defendant. *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). There the court ruled that the defendant Bruton's confrontation rights were violated when the codefendant's statement, implicating Bruton in a robbery, was admitted into evidence at their joint trial even though it was accompanied by a limiting instruction that told the jury only to consider the statement against the confessing defendant. *Id.* at 124-26. The court noted that severing trials or deleting the confession's reference to the codefendant could be effective remedies. *Id.* at 131-34.

¶17 In order to comply with *Bruton*, Washington adopted CrR 4.4(c). *State v. Hoffman*, 116 Wn.2d 51, 75, 804 P.2d 577 (1991). That provision requires severance when one codefendant's statement refers to the other codefendant unless the statement is not offered into evidence or references to the codefendant are deleted from the statement. CrR 4.4(c)(1)(i), (ii). Mr. Wilcoxon sought severance on this basis prior to trial.[4]

---

[4] CrR 4.4(a)(2) provides that the failure to renew a pre-trial motion for severance acts as a waiver of the severance request. Because Mr. Wilcoxon did not renew his motion to sever at trial, he cannot rely upon the rule for relief and does not attempt to do so on appeal.

■■ ¶18 The United States Supreme Court revolutionized its confrontation clause jurisprudence in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). There the court concluded that the right of confrontation extended only to "witnesses" who "bear testimony" against the accused. *Id.* at 51. This "testimonial" hearsay rule reflected "an especially acute concern with a specific type of out-of-court statement." *Id.* "An accuser who makes a formal statement to the government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.*[5]

¶19 Armed with this new understanding of the confrontation clause, courts have had to apply the testimonial hearsay test to varying circumstances. The Washington Supreme Court recognized that *Crawford* was particularly concerned with the "involvement by a government official" in obtaining the testimonial hearsay. *State v. Shafer*, 156 Wn.2d 381, 389, 128 P.3d 87 (2006) (child's disclosure of sexual abuse to her mother was not testimonial hearsay). "The proper test to be applied in determining whether the declarant intended to bear testimony against the accused is whether a reasonable person in the declarant's position would anticipate his or her statement being used against the accused in investigating and prosecuting the alleged crime." *Id.* at 390 n.8.

¶20 Application of that standard leads us to conclude that Nollette's statement to his acquaintance Solem was not testimonial in nature. No government official was involved in obtaining the statement and a reasonable person would not believe it would be used against Mr. Wilcoxon for the prosecution of a crime. Mr. Nollette simply was bragging about a successful heist; he was not giving formal witness against his codefendant. This statement was

---

[5] The court subsequently concluded that statements made to government officials in order to obtain emergency aid were not testimonial in nature. *Michigan v. Bryant*, 562 U.S. 344, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011); *Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

not "testimonial hearsay." Rather, it was a "casual remark" to an acquaintance. *Crawford*, 541 U.S. at 51.

■ ¶21 Accordingly, Mr. Wilcoxon's claim that the trial court needed to sever the cases to satisfy *Bruton* and its progeny fails.[6] Similarly, his argument that the court had a duty sua sponte to give a limiting instruction concerning the testimony also fails. As there was no constitutional violation, there is no basis for raising this claim initially on appeal.[7] RAP 2.5(a)(3). Unlike the federal authority cited by Mr. Wilcoxon, there is no basis in Washington law for judges giving limiting instructions without request from a party. ER 105 (judge shall give limiting instructions "upon request"). A court is under no duty to give a limiting instruction sua sponte. *See State v. Noyes*, 69 Wn.2d 441, 446-47, 418 P.2d 471 (1966); *accord State v. Russell*, 171 Wn.2d 118, 123-24, 249 P.3d 604 (2011) ("Since *Noyes*, this court has continued to hold that absent a request for a limiting instruction, the trial court is not required to give one sua sponte."); *State v. Athan*, 160 Wn.2d 354, 383, 158 P.3d 27 (2007) (the omission of a limiting instruction is not reversible error where defendant fails to request the instruction during trial); *State v. Myers*, 133 Wn.2d 26, 36, 941 P.2d 1102 (1997) ("The failure of a court to give a cautionary instruction is not error if no instruction was requested."); *State v. Hess*, 86 Wn.2d 51, 52, 541 P.2d 1222 (1975) (no reversible error for the lack of a limiting instruction where no instruction requested).

■ ¶22 "A party's failure to request a limiting instruction constitutes a waiver of that party's right to such an instruction and fails to preserve the claimed error for appeal." *State v. Newbern*, 95 Wn. App. 277, 295-96, 975 P.2d 1041 (1999). The failure to give a limiting instruction is not

---

[6] Mr. Wilcoxon did not contend in the trial court that the statements were inadmissible except for the *Bruton* claim.

[7] In light of *Bruton* itself overturning a conviction because the court had given a limiting instruction rather than severing the trials, we question whether a limiting instruction can ever be required by *Bruton*.

constitutional error, while the failure to request an instruction waives the claim on appeal. For both reasons, the argument that the trial court sua sponte needed to give a limiting instruction fails.

■■ ¶23 Although we conclude that there was no Sixth Amendment violation in this case, the result would be no different if there had been a constitutional violation. Errors of constitutional magnitude are harmless if the reviewing court is convinced, beyond a reasonable doubt, they did not contribute to the verdict. *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). That is the situation here. Although Mr. Nollette's statement that his "friend" had committed the burglary was somewhat prejudicial to Mr. Wilcoxon in light of the evidence connecting him to the telephone call, that evidence was primarily useful against Mr. Nollette on the conspiracy count—and the jury failed to reach a verdict on that count. With respect to Mr. Wilcoxon, the "friend" statement paled in light of the other evidence against him, particularly his admissions to Eric Bomar. If there had been error, it was harmless beyond a reasonable doubt.

¶24 Mr. Wilcoxon's Sixth Amendment claims are without merit. The convictions are affirmed.

¶25 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

SIDDOWAY, C.J., and FEARING, J., concur.

Review granted at 183 Wn.2d 1002 (2015).