**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 87951-1-I |
| Respondent, | |
| v. | DIVISION ONE |
| SOLOMON BLUE TUCKER, a/k/a BLUE TUCKER, a/k/a SOLOMAN BLUE TUCKER, | UNPUBLISHED OPINION |
| Appellant. | |

FELDMAN, J. — Solomon Blue Tucker appeals his convictions for theft of a motor vehicle and vehicle prowling in the second degree. Because sufficient evidence supports the convictions and Tucker has not otherwise established an entitlement to relief, we affirm the convictions but remand for correction of a scrivener's error in the judgment and sentence.

I

On November 16, 2023, Tucker and an unidentified male drove to Pack Forest, a research forest for the University of Washington with multiple hiking trails that are accessible to the public. At approximately 10:25 a.m., Tucker parked his grey Honda Accord at the end of a row of cars in the Pack Forest parking lot and kept his vehicle running. A surveillance camera at Pack Forest captured the entire

series of events without sound. Tucker exited from the driver's side of his vehicle and walked around the parking lot, looking into several parked vehicles.

Eventually, Tucker walked to a black Nissan pickup truck owned by John Wilcox and Sharon Bjurman-Wilcox. Tucker looked inside the passenger window, removed something from his pocket, and appeared to unlock the back window. He opened the passenger door and partially entered the pickup truck for more than one minute. Tucker then exited the pickup truck and returned to his Honda. The unidentified male then exited the Honda's passenger seat and walked directly to the black pickup truck that Tucker had just exited. The unidentified male then got into the driver's seat of the pickup truck.

Meanwhile, Paul Roe, a maintenance worker employed at Pack Forest, watched these events unfold on the surveillance monitor in his office. Roe knew that the unidentified male in the black pickup truck was not the owner of the pickup truck because Roe knew its owner was Wilcox, who regularly hiked at the facility. After seeing the unidentified male enter the black pickup truck, Roe realized "[s]omething's going down," and went to the parking lot with his co-worker, Chase (full name unknown). The unidentified male fled in the black pickup truck and Tucker followed in the Honda. Roe recorded the flight on his cell phone and described the pickup truck as driving "really erratically" and "out of control" at a high rate of speed. The unidentified male then slammed the pickup truck into a 16-inch curb and punctured two tires. Roe called 911 and found the pickup truck abandoned at the entrance to the facility. It was still running without a key "or anything else" in the ignition. The pickup truck's owner, Wilcox, had not given

anyone permission to drive the black pickup truck and was the only person with keys to the pickup truck.

Approximately one month after this incident, Tucker returned to the Pack Forest parking lot driving the same grey Honda. Roe called 911 again and blocked the exit to prevent Tucker from leaving. Law enforcement then arrived and arrested Tucker. In Tucker's pocket, law enforcement found a piece of a white porcelain spark plug, known as a "ninja rock," that may be used to break a window without shattering it. The State charged Tucker with theft of a motor vehicle as principal or accomplice, vehicle prowling in the second degree, and making or possessing motor vehicle theft tools. The jury convicted Tucker of theft of a motor vehicle and vehicle prowling in the second degree but acquitted him of making or possessing motor vehicle theft tools. The trial court imposed concurrent sentences for the two counts. This timely appeal followed.

II

A.    Prosecutorial Misconduct

Tucker argues the prosecutor committed misconduct by using voir dire to indoctrinate the jury and lower the State's burden of proof with respect to accomplice liability. We disagree.

During voir dire, the prosecutor asked the venire about their lay perspectives regarding accomplice liability for the crime of theft of a motor vehicle. Specifically, the prosecutor asked, "[w]hat sort of things would you all look for to try to determine if two people were working together?" In response, prospective jurors answered that they would look for such things as "Communications between the two parties," "[w]hich one actually drove the vehicle out of the site that they

took it from," "[p]roof that both parties benefited somehow from this," "[d]etailed history that would indicate a motive or a reason to take the risk in the first place," "a plan between the two of them," "working together in the past," "evidence that they both understood exactly what the end result was, that they were both actually stealing a car," and "[t]hat they were seen together."

During this colloquy, a prospective juror asked the prosecutor about the difference between being "complicit and being an accomplice." The prosecutor replied,

> So the judge will give specific jury instructions that lay out what it means to legally be an accomplice. Okay. So I don't want to jump too much ahead of it.
>
> I'm more just looking for ideas for what sort of evidence you-all would think about, you know, just from a lay perspective. Like what you would think would make something -- make two people -- okay, these two people are working together to do the same thing, right?

The prosecutor then summarized the prospective jurors' responses:

> I'm just sort of synthesizing, but people would need to look for, like, proximity and location. Right? So they're coming and they're at the same place. You know, proximity in time. They're there together at the same time . . . Some evidence that they made a plan together. These are all things that I'm hearing for how to determine whether two folks are working together.

This, Tucker claims, was prosecutorial misconduct.

Defendants have a constitutional right to a fair trial by an impartial jury. *State v. Davis*, 141 Wn.2d 798, 824-25, 10 P.3d 977 (2000). "Voir dire, the part of jury selection wherein the parties ask questions and engage in discussion with potential jurors to draw out potential bias, is central to securing the right to an impartial jury." *State v. Bell*, 26 Wn. App. 2d 821, 829, 529 P.3d 448 (2023) (citing *State v. Momah*, 167 Wn.2d 140, 152, 217 P.3d 321 (2009)). The scope of voir

dire should be coextensive with its purpose, which is "'to enable the parties to learn the state of mind of the prospective jurors, so that they can know whether or not any of them may be subject to a challenge for cause, and determine the advisability of interposing their preemptory challenges.'" *State v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369 (1985) (quoting *State v. Laureano*, 101 Wn.2d 745, 758, 682 P.2d 889 (1984)). Conversely, it is not a function of voir dire "to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law." *Id*.

Significantly, Tucker did not object to the prosecutor's summary of the prospective jurors' responses. In such a situation, we apply a heightened standard of review where Tucker must show the prosecutor's alleged misconduct was "'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.'" *State v. Zamora*, 199 Wn.2d 698, 709, 512 P.3d 512 (2022) (quoting *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). Additionally, we consider alleged prosecutorial misconduct "in the context of the case, the arguments as a whole, the evidence presented, and the jury instructions." *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021).

Applying these legal principles here, the prosecutor did not commit misconduct during voir dire by summarizing the prospective jurors' lay perspectives regarding accomplice liability. The prosecutor's summary included the phrases "proximity and location" and "evidence that they made a plan together," which referenced the prospective jurors' statements that they would look

for evidence that "they were seen together," evidence of who "actually drove the vehicle out of the site that they took it from," and evidence of "a plan between the two of them." Additionally, the prosecutor told prospective jurors the judge would instruct the jury regarding the law and that the prosecutor was only discussing the prospective jurors' pre-existing lay perspective regarding accomplice liability. The court's subsequent jury instructions correctly detailed the applicable standard for accomplice liability. Thus, when viewed in the context of the entire trial, the prosecutor neither indoctrinated the jury nor minimized the State's burden of proof regarding accomplice liability. Because we find no prosecutorial misconduct, let alone flagrant and ill intentioned misconduct, Tucker is not entitled to a new trial on this basis.

Despite this, Tucker argues the prosecutor advocated for a "same place, same time" accomplice liability theory which lowered the State's burden of proof and allowed the jury to rely on constructive knowledge to convict him. Tucker relies on *State v. Cronin*, 142 Wn.2d 568, 14 P.3d 752 (2000), and *State v. Allen*, 182 Wn.2d 364, 341 P.3d 268 (2015), but such reliance is misplaced. In *Cronin*, the jury was given an erroneous instruction that permitted it to find accomplice liability if the defendant merely had general knowledge that their actions would promote "a crime," instead of specific knowledge that their conduct would promote or facilitate the specific crime for which they were charged. 142 Wn.2d at 578-79. Similarly, in *Allen*, the prosecutor repeatedly argued the defendant was guilty as an accomplice if they "should have known" the principal would commit the charged crime. 182 Wn.2d at 371-72. Here, in contrast to *Cronin*, the trial court provided the jury with an instruction that contained the correct standard for accomplice

liability. Additionally, unlike *Allen*, the prosecutor here did not instruct the jurors on the legal definition of accomplice liability or advocate for a lesser standard of knowledge for accomplice liability. Neither case supports Tucker's arguments.

B.      Video Narration Testimony

Tucker argues the trial court prejudiced his right to a fair trial by permitting a witness to narrate the surveillance video for the jury. We disagree.

During the State's case in chief, Roe authenticated the surveillance video the State sought to introduce into evidence and the trial court admitted the video based on this testimony. The State then played it for the jury. While the video was playing, the prosecutor asked Roe to "describe what we just saw." Roe responded that it "appears to be a grey Honda Accord with a broken grill and custom wheels pulling up to the parking lot." A few seconds later, the prosecutor asked Roe again, "can you describe what we're watching right now?" As Roe began to answer, defense counsel objected to the prosecutor's question, stating "I don't think there needs to be a narration." The trial court overruled the objection and Roe continued his testimony, stating "[i]t appears someone is looking into vehicles that do not belong to them" and also "[i]t appears that they're looking for anything to steal in a vehicle that's not –." Defense counsel objected to the latter testimony on speculation grounds and the court sustained the objection. A few moments later, the prosecutor paused the surveillance video and again asked Roe to "describe what we're seeing right now?" Roe responded that the video showed "myself and my coworker, Chase, try to confront them about what they just did."

This lay witness opinion testimony is governed by ER 701. ER 701 instructs that if a witness is not testifying as an expert, they may not testify in the form of an

opinion unless that opinion is (1) rationally based on the perception of the witness, (2) helpful to a clear understanding of the testimony or a determination of a fact in issue, and (3) not based on scientific, technical, or other specialized knowledge. ER 701. For lay opinion testimony to be helpful under ER 701, and thus admissible at trial, "there must be some finding that the jury had a need for the evidence." *State v. Sanjurjo-Bloom*, 16 Wn. App. 2d 120, 127, 479 P.3d 1195 (2021). We review a trial court's evidentiary rulings for abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022). Such abuse occurs if the trial court's exercise of discretion is manifestly unreasonable or based on untenable grounds or reasons. *Sanjurjo-Bloom*, 16 Wn. App. 2d at 125.

*Sanjurjo-Bloom* is instructive here. There, the defendant was charged with robbery and the State introduced surveillance video that captured the incident. 16 Wn. App. 2d at 123-25. An officer who was not present for the incident testified he recognized the defendant in the surveillance video based on previous interactions with the defendant. *Id.* at 123-24. The court held the officer's lay opinion testimony was improper because it was unnecessary, cumulative, and not helpful to the jury. *Id.* at 126-27. The surveillance video was of good quality; therefore, the jury did not need help in making an identity determination. *Id.* at 126. Because there was no need for the officer's lay opinion, it was not helpful and was thus inadmissible. *Id.* at 127.

Guided by these legal principles, we conclude the trial court did not abuse its discretion in overruling Tucker's objection to Roe's narration testimony. Notably, Roe was both a percipient witness to the acts captured on the surveillance video and a narrative witness at trial. His testimony provided context and

- 8 -

background for the surveillance video. Additionally, the testimony was based in large part on Roe's direct knowledge and participation in the events shown on the video. For example, Roe was able to testify about the grey Honda Accord because he personally observed that vehicle when he walked to the parking lot that morning. Roe knew that "an elderly gentleman" owned the black pickup truck Tucker was looking into; thus, his testimony that the pickup truck did not belong to Tucker was based on personal knowledge and that fact was not obvious to the jury merely by watching the video. And when Roe testified that the video showed himself and his co-worker walking to the parking lot, he was providing context for the jury to understand who had just appeared in the surveillance video. Thus, the testimony was rationally based on Roe's personal knowledge as a percipient witness, provided relevant context for the events captured on the video, and was helpful for the jury in viewing and understanding the video.

Even if we assume the trial court abused its discretion, any error in allowing the narration testimony was harmless. Applying the non-constitutional harmless error test, which requires the defendant to show that "'within reasonable probabilities . . . the outcome of the trial would have been materially affected' had the error not occurred," *State v. Barry*, 183 Wn.2d 297, 317-18, 352 P.3d 161 (2015) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)), this testimony merely reiterated evidence already before the jury. Additionally, the jury viewed the surveillance video and was able to independently determine what it showed and what significance it had. The jury was instructed that it was the sole judge of the credibility of each witness and the value or weight to be given to the testimony. Further, as discussed in Section II.E below, there was ample other

- 9 -

evidence to convict Tucker of theft of a motor vehicle and second-degree vehicle prowling. On this record, Tucker fails to show the outcome of the trial was materially affected by the admission of this narration testimony.

C.    Improper Opinion On Guilt

Tucker argues he is entitled to a new trial because Roe made several statements constituting an improper opinion on guilt. We disagree.

Tucker points to three separate statements Roe made during his direct examination that he claims constituted improper opinions on guilt. First, Roe testified he called 911 because he "witnessed an attempted grand theft auto." After an immediate objection from defense counsel, the trial court sustained the objection, granted the defense's motion to strike the testimony, and instructed the jury to disregard the testimony. Second, Roe testified that while watching the monitor in his office, "[i]t appeared to me to be a car break-in, and I said, hey, Chase, let's go --." Defense counsel objected based on hearsay grounds and the trial court overruled the objection. Third, in response to the prosecutor's request that Roe describe the surveillance video, Roe testified, "[it] appears that they're looking for anything to steal in a vehicle that's not --." Defense counsel objected based on speculation grounds and the trial court sustained the objection.

Washington courts have consistently held that "a remark 'can touch on a constitutional right but still be curable by a proper instruction." *State v. Hager*, 171 Wn.2d 151, 159, 248 P.3d 512 (2011) (quoting *State v. Smith*, 144 Wn.2d 665, 679, 30 P.3d 1245 (2001) (superseded by statute)). For example, in *Hager*, an officer testified that the defendant had been evasive. *Id.* at 155. This testimony was in direct violation of the trial court's pre-trial order, and the defense

immediately moved for a mistrial. *Id.* The trial court denied the defense's motion and instead sustained the defense's objection to the testimony and instructed the jury to disregard the officer's remark. *Id.* at 155, 159. On appeal, the Washington Supreme Court concluded the officer's testimony, while improper, did not warrant a new trial because the trial court had cured the improper testimony by sustaining the defense's objection and instructing the jury to disregard the testimony. *Id.* at 159-160. Additionally, the court noted the jurors were provided with written instructions that they were not to discuss or consider any evidence they had been instructed to disregard during the trial. *Id.*

Similarly here, the trial court cured any prejudice Roe's first and third comments may have caused by sustaining the defense's objection to the testimony and instructing the jury to disregard it. As in *Hager*, the jurors here were also provided with written instructions that they were not to consider any evidence that was stricken from the record, and we presume the jury follows these instructions. *State v. Rivers*, 1 Wn.3d 834, 869-70, 533 P.3d 410 (2023). While not all improper testimony may be susceptible to a curative instruction and may instead require a new trial to protect a defendant's constitutional rights, here Roe's testimony was not so prejudicial that it could not have been cured by the trial court's instruction to the jury. Thus, the trial court properly cured any prejudice caused by Roe's first and third comments.

Turning to the second comment—"[i]t appeared to me to be a car break-in,"—Tucker did not raise a constitutional challenge in the trial court. Instead, he objected to the testimony solely on hearsay grounds. Because a party may assign error on appeal only on the specific ground of the evidentiary objection made at

trial, Tucker failed to properly preserve this challenge for appeal. *See, e.g., State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); *State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976). However, we may review this argument if Tucker can establish the manifest constitutional error standard in RAP 2.5(a)(3). *State v. Ianniciello*, __ Wn. App. 2d __, 582 P.3d 372, 375 (2026). He satisfies that standard here. First, the asserted error implicates his constitutional right to a jury trial. *See State v. King*, 167 Wn.2d 324, 329-30, 219 P.3d 642 (2009) ("Opinion testimony regarding a defendant's guilt is reversible error if the testimony violates the defendant's constitutional right to a jury trial, which includes the independent determination of the facts by the jury."). Second, the asserted error is manifest as Tucker has made a plausible showing that (1) the error had practical and identifiable consequences, and (2) any error is obvious on the record and "should have been reasonably obvious to the trial court" so as to warrant appellate review. *Ianniciello*, 582 P.3d at 376 (quoting *State v. O'Hara*, 167 Wn.2d 91, 99-100, 108, 217 P.3d 756 (2009)).

But while we may properly review the asserted error, Tucker is not entitled to a new trial on this basis because any such error was harmless beyond a reasonable doubt. *See State v. Kalebaugh*, 183 Wn.2d 578, 585, 355 P.3d 253 (2015) ("Harmless error analysis occurs *after* the court determines the error is a manifest constitutional error and is a separate inquiry."). The Washington Supreme Court has recently clarified the correct approach for appellate courts conducting constitutional harmless error review. *See State v. Magana-Arevalo*, 582 P.3d 330, 345, 348 (2026). "[T]he reviewing court must ask whether the State has proved the error harmless beyond a reasonable doubt, considering *both* the

strength of the properly admitted evidence of guilt as well as the prejudicial impact of the erroneously admitted evidence on even the properly admitted evidence." *Id.* at 345. Therefore, we must consider "(1) the corrosive impact of the constitutional error (here, the improperly admitted evidence), including its impact on how the fact finder might consider even the properly admitted evidence, as well as (2) the strength of the properly admitted evidence of guilt." *Id.* at 348. We then consider "the impact of both types of evidence" and "ask whether the State has carried its burden of proving that the constitutional error is harmless beyond a reasonable doubt." *Id.*

Applying this framework here, the State has proved the error harmless beyond a reasonable doubt. As to the first consideration, the State's evidence demonstrating Tucker's guilt was strong. The State introduced the surveillance video which clearly showed Tucker enter the black pickup truck and remain partially inside it for over a minute, and the owners of the pickup truck testified that they had not given anyone permission to be in the vehicle. Turning to the second consideration, Roe's testimony regarding observing a car break-in did not have a significant corrosive or prejudicial effect on the properly admitted evidence, including the surveillance video. Roe's testimony went to the vehicle prowling charge that defense counsel essentially conceded in closing argument, noting "Vehicle prowl in the second degree, well, we saw it on video," "I don't really think that that's seriously in dispute," and "I'm not seriously suggesting that that didn't happen when it's on video." Further, Roe's testimony did not prejudice the jury's deliberation or the properly admitted surveillance video as the jurors watched the

video themselves and could conclude for themselves what it showed. Thus, any error was harmless.[1]

D.    Constitutional Right To Unanimous Verdict

Tucker argues because accomplice liability can be shown through alternative means, the prosecution violated his right to a unanimous jury verdict by failing to present sufficient evidence to convict him of vehicle theft on both prongs of accomplice liability. We disagree.[2]

Before the court instructed the jury, the parties engaged in a colloquy with the court and reviewed the proposed jury instructions. The jury instruction regarding accomplice liability provided as follows:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
>
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing the crime.

---

[1] Tucker also argues he is entitled to reversal under the cumulative error doctrine because the misconduct during voir dire, the improper narration testimony, and the improper guilt opinions "progressively made it easier for the prosecution to prove accomplice liability, denying Mr. Tucker a fair trial." But "where there are few or no errors, and the errors, if any, have little or no effect on the outcome of the trial, reversal is not required." *State v. Ritchie*, 24 Wn. App. 2d 618, 644 n.9, 520 P.3d 1105 (2022) (citing *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006)). Based on a careful review of each instance of alleged prosecutorial misconduct and improper witness testimony in the context of the entire trial, no cumulative error exists here that would necessitate a new trial.

[2] Although Tucker raises this issue for the first time on appeal, jury unanimity concerns are constitutional in nature and may be raised for the first time on appeal under the manifest constitutional error standard in RAP 2.5(a). *See State v. Aguilar*, 27 Wn. App. 2d 905, 918, 534 P.3d 360 (2023).

> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

*See also* RCW 9A.08.020. Thus, to establish this offense, the State was required to show that Tucker either (a) solicited another person or (b) aided another person in the commission of the crime.

Tucker's unanimity argument fails, at the outset, because accomplice liability is not a crime. Division Three of our court recently rejected a similar argument to the one that Tucker presents here. In *In re Personal Restraint of Quintero*, 29 Wn. App. 2d 254, 541 P.3d 1007 (2024), the defendant was charged with two counts of murder in the first degree while armed with a firearm and one count of unlawful possession of a firearm in the first degree. *Id.* at 1016. The to-convict instructions for the murder charges required the State to prove "the defendant, or an accomplice, caused the death" of each victim. *Id.* at 1025 n.3. Based on this instruction, which deviated from the typical to-convict instruction given at trial, the defendant argued the inclusion of two different means for finding a person was an accomplice required the State to either elect one of the means or prove both he and an accomplice committed murder in the first degree. *Id.* at 1025 n.3, 1026.

Division Three disagreed, holding the alternative means doctrine had no application to the case. First, the court stated that "being an accomplice is not a crime in itself." *Id.* Our court has likewise concluded that "[a]ccomplice liability is not a separate crime—it is predicated on aid to another 'in the commission of a

crime' and is in essence liability for that crime." *State v. Peterson*, 54 Wn. App. 75, 78, 772 P.2d 513 (1989) (citing RCW 9A.08.020(3); *State v. Toomey*, 38 Wn. App. 831, 840, 690 P.2d 1175 (1984) ("There is no separate crime of being an accomplice.")); *see also State v. Jackson*, 87 Wn. App. 801, 818, 944 P.2d 403 (1997). Second, the court noted that definitional instructions do not implicate the alternative means doctrine. *Matter of Quintero*, 29 Wn. App. 2d at 282-83. This position, also, is well supported by Washington precedent. *See, e.g., State v. Linehan*, 147 Wn.2d 638, 646, 56 P.3d 542 (2002) ("Definition statutes do not create additional alternative means of committing an offense."); *State v. Smith*, 159 Wn.2d 778, 787, 154 P.3d 873 (2007).

Because *Matter of Quintero* is persuasive, supported by Washington Supreme Court precedent, and on point here, we likewise conclude that accomplice liability is not an alternative means crime. Further, the portion of the accomplice liability jury instruction at issue—that Tucker could be an accomplice if he either solicited another person or aided another person in the commission of the crime—is drawn directly from the accomplice liability statute, RCW 9A.08.020. It is merely a definitional instruction that provides liability for a crime: here, the crime of theft of a motor vehicle. Therefore, Tucker's argument fails as a matter of law because the alternative means doctrine has no application in this case.

But even if we were to conclude that accomplice liability is an alternative means crime, Tucker's argument also fails because the State made an "election" at trial to focus exclusively on how Tucker "aided" the unidentified male to commit the vehicle theft. "[I]f the State expressly elects to rely on only one alternative means to obtain a conviction, the State need not present sufficient evidence of all

alternative means in order to avoid violating the defendant's right to a unanimous verdict." *State v. Smith*, 17 Wn. App. 2d 146, 159, 484 P.3d 550 (2021). The State need not formally plead its election or incorporate it into the information. *Id.* "As long as the election clearly identifies the particular acts on which charges are based, verbally telling the jury of the election during closing argument is sufficient." *Id.* (citing *State v. Carson*, 184 Wn.2d 207, 227, 357 P.3d 1064 (2015)). For example, in *Smith*, the prosecutor clearly made an election during closing argument as to the acts constituting residential burglary when the prosecutor stated "it was his remaining after she told him to leave. That's the part that's unlawful." *Id.* at 159. The court concluded the State clearly elected the "remains unlawfully" means and that means was supported by sufficient evidence; thus, the defendant's right to a unanimous verdict was not violated. *Id.* at 160.

Similarly here, even if the alternative means doctrine applied to accomplice liability, the State made a proper election during closing argument:

> So now we need to know what does it mean to be an accomplice in the eyes of the law. It specifically gives you those two things. So we'll read all these together. A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either, one, solicits, commands, encourages, or requests another person to commit the crime, or two, aids or agrees to aid another person in planning or committing the crime.
>
> So it has to be with knowledge that will promote or facilitate the commission, and then it can be one of those two things. . .
>
> It also gives some helpful definitions there below. So the "aid" word means all assistance whether given by words, acts, encouragement, support, or presence. . .
>
> We've heard testimony and we see the video. Mr. Tucker drove -- the person that actually ended up stealing the truck, Mr. Tucker drove

- 17 -

them to that location.  They rode together.  Mr. Tucker is the driver; the other person is the passenger.

It's a remote location. By its very necessity, if you wanted to steal a vehicle from this location, you would need to drive out there.  So, by driving out there, *Mr. Tucker aided him in committing the crime.*

So that leads us to which is -- *that satisfies that portion of the accomplice requirement.*

(Emphasis added.)  A few moments later, the State again highlighted its election:

So under that -- under this definition of an accomplice in Instruction No. 7 we know that Mr. Tucker had knowledge that he was promoting or facilitating the commission of this crime, and *he aided this individual* by driving out there, by scouting and selecting the vehicle, and then leaving immediately with this other individual as they pulled away.

A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. We know Mr. Tucker is present at the scene.  We know that he is ready to assist because he did assist. He drove the individual out there, and then he scouted out the vehicle.  Maybe if Mr. Tucker just drove out there and didn't do anything else, maybe that wouldn't be enough. Maybe. But it's more than that. It's more than just Mr. Tucker driving this individual out there. He scouts out these vehicles, selects one, identifies it, and enters it on behalf of this other individual.

(Emphasis added.)   During the defense's closing argument, defense counsel appeared to agree that the State had made an election by focusing exclusively on whether Tucker aided the unidentified male.

So number one is solicits, commands, encourages, requests another person commit the crime. And section one, in my opinion - - and I'm submitting to you - - is just out.  Right? There's no evidence that there was any solicitation . . .

So really, in my opinion, what we're dealing with is section 2, and that's kind of what I think the State was hammering as well, which is aid or agrees to aid another person.

- 18 -

Thus, the State focused exclusively on whether Tucker aided his accomplice and what acts constituted that aid. If an election was required here, the State did so. For this reason too, Tucker's argument fails.

E.    Sufficiency of the Evidence

Tucker argues the State presented insufficient evidence to support his conviction of theft of a motor vehicle as an accomplice. We disagree.

To convict Tucker of theft of a motor vehicle, the jury instructions required the State to prove he "wrongfully obtained or exerted unauthorized control over a motor vehicle of another" with "intent[] to deprive the other person of the motor vehicle." The trial court also instructed the jury on the definition of an accomplice as detailed in Section II.D above. Accordingly, to convict Tucker on this charge, the State was required to prove beyond a reasonable doubt that Tucker aided or agreed to aid another person knowing his aid would promote or facilitate the motor vehicle theft.

In determining whether sufficient evidence supports the jury's verdict, we must assess "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Zghair*, 4 Wn.3d 610, 619-20, 567 P.3d 1 (2025) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Our standard of review in a challenge to the sufficiency of the evidence is "'highly deferential to the jury's decision.'" *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024) (quoting *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014)). "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from

it." *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Additionally, "[c]ircumstantial and direct evidence are equally reliable, and we defer to the trier of fact on conflicting testimony, witness credibility, and the persuasiveness of the evidence." *State v. Raleigh*, 157 Wn. App. 728, 736-37, 238 P.3d 1211 (2010).

Applying this deferential standard, we conclude there is sufficient evidence to support Tucker's conviction of theft of a motor vehicle as an accomplice. The State presented surveillance video evidence showing that Tucker drove himself and the unidentified male to the Pack Forest parking lot. Moments later, the video shows that Tucker exited his vehicle and began looking into several vehicles that were parked in the lot. Tucker then walked to the black Nissan pickup truck, looked inside the passenger window, and opened the passenger door. After opening the door and partially entering the vehicle for more than one minute, Tucker returned to his vehicle and sat in the driver's seat. The unidentified male then exited Tucker's vehicle, walked directly to the same black pickup truck, and drove the truck away. The surveillance video also captures Tucker following the black pickup truck out of the parking lot in his vehicle. This evidence, with all reasonable inferences drawn in favor of the State, was sufficient for the jury to conclude Tucker acted as an accomplice to the theft of the black pickup truck.

Despite this, Tucker argues the State failed to prove that he knew the other person intended to commit car theft and that he acted to aid the car thief. Tucker relies on *State v. Asaeli*, 150 Wn. App. 543, 208 P.3d 1136 (2009), to argue that

merely driving a person to the scene of a crime is insufficient evidence of accomplice liability. There, the defendant was convicted of second-degree felony murder as an accomplice. 150 Wn. App. at 568, 570. The State's evidence established that the defendant drove a group of individuals to a park, was present at that park, and was aware that some of the group members were trying to locate the victim. *Id.* at 568. But no evidence established that the defendant was aware of any plan of the group's members to assault or shoot the victim. *Id.* at 569. The court concluded the defendant's mere presence at the scene with knowledge that others were looking for the victim was not sufficient to support the conviction.[3] *Id.* at 570. Here, in contrast, as the above discussion shows, there is sufficient evidence to support Tucker's conviction of theft of a motor vehicle as an accomplice, including driving the accomplice to the parking lot, identifying the black pickup truck, and leaving together. On this record, Tucker's reliance on *Asaeli* is misplaced.

F.      Double Jeopardy

Tucker further argues his right against double jeopardy was violated because his two convictions are the same in both law and fact. We disagree.[4]

---

[3] Much the same is true of *State v. Luna*, 71 Wn. App. 755, 862 P.2d 620 (1993), which Tucker also relies on. In *Luna*, the defendant was convicted as an accomplice to the crime of taking a motor vehicle without permission. 71 Wn. App. at 756. Luna was part of a group of juveniles that were vehicle prowling. *Id.* A member of the group, Lauriton, had driven the group in a Camaro but had stopped the Camaro and walked away. *Id.* Luna and the other juveniles were standing near the Camaro when they saw Lauriton speed past them, driving a stolen truck. *Id.* The group jumped back into the Camaro and Luna began driving it, following Lauriton. *Id.* Luna's conviction as an accomplice was reversed because the State presented no evidence that Luna knew of Lauriton's intent to steal the truck before the theft occurred. *Id.* at 759.

[4] Although Tucker raises this issue for the first time on appeal, we may properly address it. Washington courts have long held double jeopardy claims may be raised for the first time on appeal under RAP 2.5(a)(3). *See State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006); *State v. Adel*, 136 Wn.2d 629, 631-32, 965 P.2d 1072 (1998).

The double jeopardy provisions of our federal and state constitutions bar multiple punishments for the same offense. *State v. Kelley*, 168 Wn.2d 72, 76, 226 P.3d 773 (2010); U.S. Const. amend. V; Wash. Const. art. I, § 9. We review double jeopardy claims de novo. *State v. Ray*, 5 Wn.3d 350, 363, 575 P.3d 321 (2025). Where, as here, a defendant's act supports charges under two criminal statutes, we "must determine whether, in light of legislative intent, the charged crimes constitute the same offense." *State v. Nysta*, 168 Wn. App. 30, 44, 275 P.3d 1162 (2012). "The mere fact that the same *conduct* is used to prove each crime is not dispositive." *Id.* at 44-45. "'If the legislature authorized cumulative punishments for both crimes, then double jeopardy is not offended.'" *State v. Arndt*, 194 Wn.2d 784, 815, 453 P.3d 696 (2019) (quoting *State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005)).

To determine whether the legislature intended to impose cumulative punishments, we follow four analytical steps: "(1) consideration of any express or implicit legislative intent, (2) application of the *Blockburger*,[5] or 'same evidence,' test, (3) application of the 'merger doctrine,' and (4) consideration of any independent purpose or effect that would allow punishment as a separate offense." *Id.* at 816 (citing *Freeman*, 153 Wn.2d at 771-73); *see also Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). "If legislative intent to allow separate punishments can be found in any of the four steps of the analysis, then there is no double jeopardy violation." *State v. Heng*, 22 Wn. App. 2d 717, 732, 512 P.3d 942 (2022), *aff'd*, 2 Wn.3d 384, 539 P.3d 13 (2023).

---

[5] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

Tucker addresses only the first two analytical steps. As to the first step, "'[i]f there is clear legislative intent to impose multiple punishments for the same act or conduct, this is the end of the inquiry and no double jeopardy exits.'" *Ray*, 5 Wn.3d at 364 (quoting *Arndt*, 194 Wn.2d at 816). But if legislative intent is not clear, we proceed to the second analytical step. *Id.* Under the controlling *Blockburger* test, "double jeopardy principles are violated if the defendant is convicted of offenses that are identical in fact and in law." *In re Pers. Restraint of Borrero*, 161 Wn.2d 532, 537, 167 P.3d 1106 (2007). We compare the legal elements of both offenses as charged and proved, not merely abstractly, to determine whether they are the same in law and fact. *Freeman*, 153 Wn.2d at 776. To do so, we analyze "'whether each provision requires proof of a fact which the other does not.'" *Ray*, 5 Wn.3d at 367 (quoting *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 817, 100 P.3d 291 (2004)). But this analysis "has nothing to do with the *evidence* presented at trial" and is "concerned solely with the *statutory elements* of the offenses charged." *Id.* at 368 (quoting *Grady v. Corbin*, 495 U.S. 508, 521 n.12, 110 S. Ct. 2084, 109 L. Ed. 2d 548 (1990), *overruled on other grounds by United States v. Dixon*, 509 U.S. 688, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993) (partial plurality opinion)). "This focus on the statutory elements of each offense is necessary because the double jeopardy clause does not prohibit multiple punishments based on the same *conduct* or the same *evidence*." *Id.* Rather, "the double jeopardy clause prohibits multiple punishments for the same *offense*, as defined by the legislature." *Id.* (emphasis in original).

*Ray* is instructive regarding this analysis. There, the defendant was charged and convicted of second degree assault with a deadly weapon and felony

harassment for threatening his wife with a gun. *Id.* at 353. Ray challenged his convictions on double jeopardy grounds because the State relied on the same conduct to prove both that Ray assaulted his wife and that he harassed her. *Id.* at 361, 368. The Washington Supreme Court agreed the two convictions were "identical in fact" because they were based on the same conduct but determined the two convictions were not the same in law. *Id.* at 370-71. The assault offense required that the jury find Ray intentionally assaulted his wife with a deadly weapon by committing an act that made his wife feel reasonable apprehension and imminent fear of bodily injury. *Id.* at 371. The harassment offense, in contrast, required that the jury find Ray knowingly threatened to kill his wife by communicating his intent to kill her. *Id.* "Because each offense required proof of an element that the other did not, neither conviction necessarily proved the other," meaning the two convictions were not the same in law and did not violate double jeopardy. *Id.* at 372.

The same reasoning and result apply here because the elements for vehicle theft and vehicle prowling each required proof of a fact the other did not. While the State relied on Tucker's actions of "scoping and scouting out" vehicles and the fact that he "entered" the black pickup truck to establish that he was guilty of both offenses, this conduct could establish at most only that Tucker's convictions are the same in fact. The to-convict elements of theft of a motor vehicle required that the State prove Tucker aided his accomplice in wrongfully obtaining or exerting unauthorized control over the black pickup truck. By contrast, vehicle prowling in the second degree did not require that any control be obtained or exerted. Instead, the vehicle prowling offense required the State to prove that Tucker unlawfully

entered or remained in the pickup truck. As in *Ray*, the elements of these charged offenses were different even though the State used the same conduct to prove both charges. Thus, Tucker's convictions of theft of a motor vehicle and vehicle prowling do not violate double jeopardy because they are not the same in law.

Tucker's contrary arguments lack merit. Tucker argues that various courts have "found double jeopardy violations where a conviction for car theft is accompanied by convictions for lesser car-related crimes." Tucker relies on *State v. Lass*, 55 Wn. App. 300, 777 P.2d 539 (1989), but *Lass* is inapposite. There, the defendant argued his vehicle prowling conviction should merge into his conviction for taking a motor vehicle without permission. 55 Wn. App. at 308. The court agreed merger was proper because "no additional steps were necessary to complete both charges." *Id.* Here, in contrast, the merger doctrine has no application because neither of Tucker's convictions is a lesser included offense of the other. *See Ray*, 575 P.3d at 328 ("the merger doctrine is applicable *only* in cases involving lesser included offenses"). Additionally, this court in *State v. L.U.*, 137 Wn. App. 410, 416-17, 153 P.3d 894 (2007), has disapproved of the court's reasoning in *Lass* regarding the merger doctrine. Thus, Tucker's argument is unpersuasive.

G.    Scrivener's Error

Tucker was found guilty of vehicle prowling in the second degree following a jury trial. But the judgment and sentence erroneously states that Tucker pled guilty to this charge. This "scrivener's error" is thus a "clerical mistake that, when amended, would correctly convey the trial court's intention based on other evidence." *See State v. Wemhoff*, 24 Wn. App. 2d 198, 202, 519 P.3d 297 (2022).

The remedy for scrivener's errors in a judgment and sentence is a remand to the trial court for correction. *State v. Sullivan*, 3 Wn. App. 2d 376, 381, 415 P.3d 1261 (2018). The State concedes the error should be corrected on remand. We accept the State's concession and remand for correction of the scrivener's error as a ministerial matter.

Affirmed and remanded for correction of scrivener's error.

Feldman, J.

WE CONCUR:

Birk, J.